BRENDA K. CARRIGAN, a/k/a Brenda K. Nunn, Plaintiff-Appellee, *v.* NEW WORLD ENTERPRISES, LTD., *et al.*, Defendants-Appellants.

Third District   No. 82—221

Opinion filed February 17, 1983.

Jeffrey W. Jackson and George D. Browning, both of Westervelt, Johnson, Nicoll and Keller, of Peoria, for appellants.

Richard L. Steagall and John P. Nicoara, both of Peoria, for appellee.

JUSTICE SCOTT delivered the opinion of the court:

Brenda K. Carrigan, formerly known as Brenda K. Nunn, the plaintiff, filed suit against the defendants, New World Enterprises, Ltd., and Layco, Inc. The plaintiff's action against the defendants, who were her landlord and its agents, was for injuries received from being raped, which she alleged resulted from defendants' failure to repair a burglar alarm located in her apartment. After trial by jury the plaintiff was awarded $125,000 in compensatory damages and $50,000 in punitive damages.

The plaintiff entered into a one-year lease of an apartment in a large (108 units) complex of apartments and condominiums. A provision of the lease provided that "the lessee shall give the lessor prompt notice of any defects in or accidents to the water or steam pipes, electric wiring, heating or air conditioning apparatus or any other part of the leased premises, in order that the same may be repaired with due diligence." Prior to signing the lease the plaintiff was shown the apartment and Gerald Law, principal shareholder and officer of Layco, and Carolyn Tindall, an officer of New World and an employee of Layco, emphasized, *inter alia*, that a burglar alarm was located in the apartment. A sales brochure distributed to prospective tenants or purchasers of the units in the complex emphasized that the units included a fire and smoke detector and an electronic security alarm system with an individual master control for each switch.

During the evening of July 25, 1980, plaintiff spent the evening with some girlfriends in Peoria, celebrating the birthday of one of them. She left a downtown steakhouse at approximately 2:30 a.m. and arrived at her apartment complex at approximately 3 a.m. Upon opening her apartment door she heard some keys or tapping noise which

she thought was caused by her then live-in boyfriend, Terry Carrigan, and who was later to be her husband. She called out to Terry Carrigan but received no response. Walking down the hallway leading to her bedroom she encountered her assailant. At gunpoint she was led to an automobile, put into the vehicle's trunk and taken to an unknown place where she was twice raped. In a manner not germane to the appeal, the plaintiff made her way to her sister's house, where the Peoria police were notified.

A removed screen and pry marks on a first-floor window indicated that the assailant gained entry to the apartment through the window. At trial, everyone agreed that the burglar alarm in plaintiff's apartment was not operable at the time plaintiff was abducted. If operable it would have emitted an audible sound. Testimony regarding the time when the defendants knew that the alarm was inoperable was contradictory. On direct examination plaintiff testified that the alarm in her apartment had not worked for six months prior to the assault and that the defendants had knowledge of this fact. On cross-examination plaintiff admitted submitting a note to Layco's resident manager, Carolyn Tindall, on June 26, 1980, or one month before the abduction, which stated:

> "Carolyn, I finally checked my alarm last night and found it does not work. Do you remember when you told me there were parts taken out of a few of them and never put back? Maybe mine is one of them. Could you have someone look at it?"

The plaintiff testified that she would not activate the alarm every time she left the apartment. Terry Carrigan, who had moved in with the plaintiff in May or June of 1980, testified that he had set the alarm a couple of times but as a general rule he would not activate the alarm. He further testified that before moving in with the plaintiff neither he nor plaintiff normally activated the alarm.

Before directing attention to the issues presented in this appeal, we note that taken with the case was a pleading filed by the plaintiff entitled "Application to Amend Complaint to Conform to Proof." Objections to this pleading were filed by the defendants. We grant plaintiff's application or motion to amend complaint to conform to proof. The third complaint of the plaintiff as amended alleges that defendant had actual knowledge of the availability of repairs to the alarm system and that defendant had constructive knowledge of 15 entities listed in the Peoria telephone book which related to burglar alarms. Secondly, the third amended complaint as amended alleges notice to the defendants that plaintiff's alarm was not working in late January 1980 rather than in late May, and that defendants had more notice

both orally and in writing of the inoperable alarm than which was alleged in the third amended complaint.

We first address the issue raised by the defendants, which is that the plaintiff's complaint as amended fails to state a cause of action since it attempts to impose a duty upon the defendants which is not recognized by the Illinois courts. Stated in the context of the facts as established by the evidence, it is plaintiff's theory that the defendants breached their duty to repair the burglary alarm, thereby permitting the rapist to enter the plaintiff's apartment by prying open a window, after which he abducted the plaintiff and raped her.

■ Whether the plaintiff's theory should be rejected or accepted can only be determined after a careful examination of the case law relating to a landlord's duty to protect persons on his premises (in this instance a tenant) against criminal activities of third persons. The general rule in Illinois is that a landlord does not owe a tenant a duty to protect him from criminal acts. (See *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 399 N.E. 596.) In a case strikingly similar to the instant case, this general rule was applied. (See *Stelloh v. Cottage 83* (1964), 52 Ill. App. 2d 168, 201 N.E.2d 672.) In *Stelloh* a 69-unit apartment building was involved and the landlord provided a private police force for the protection of the tenants. The police force was represented to the tenants "as giving a special and added protection to the security and safety of the occupants." (52 Ill. App. 3d 168, 170, 201 N.E.2d 672.) The plaintiff Stelloh was a tenant in a first-floor apartment. In the housing project there had been a series of break-ins, burglaries and rapes which were known to the defendant. On August 31, 1960, underneath the window of plaintiff's apartment, an individual was arrested for carrying a concealed knife. The defendant failed to warn the plaintiff of possible danger or provide protection for her and on September 23, 1960, the individual who had previously been arrested entered plaintiff's apartment through the window and raped her. Plaintiff Stelloh filed suit for damages on the theory that the defendant knew or should have known that plaintiff was in a position of danger and that by employing a private police force, defendant assumed a duty to warn plaintiff and to use reasonable care to protect her from criminal activities.

The appellate court affirmed the trial court's judgment dismissing the plaintiff's complaint. The reviewing court held that no duty was alleged in the complaint, stating:

> "The undertaking alleged (that defendant's private police would give a special and added protection to the securing and safety of its tenants) cannot reasonably be construed as insur-

ance of absolute protection against crime. Even the assignment of an armed personal bodyguard with full police authority (which defendant did not have) could not guarantee such a result." 52 Ill. App. 3d 168, 171, 201 N.E.2d 672, 673.

In the instant case, as in *Stelloh*, we have a landlord who voluntarily provided burglary alarms and the presence of the device was emphasized to prospective tenants. Also in the instant case, as in the case of *Stelloh*, the plaintiff was raped and seeks to impose an absolute duty upon the defendants to protect her from such criminal act. The installation of burglary alarms cannot be construed as absolute protection against crime. Even if the alarm had been operable, it can only be speculated that the plaintiff would have made it operable on the night the crime occurred and again one must engage in speculation that when the rapist activated the alarm he would have fled.

It has been held that where plaintiff brought action against landlord to recover damages for injuries received when she was shot by an intruder who entered her apartment, robbed her and attempted to rape her, that the trial court's order dismissing the complaint for failure to state a cause of action was correct even though it alleged the landlord, after having knowledge of needed repairs, failed to repair door locks in common areas, to-wit, window locks and broken windows. See *Martin v. Usher* (1977), 55 Ill. App. 3d 409, 371 N.E.2d 69.

In *Martin* the reviewing court, relying on the case of *Trice v. Chicago Housing Authority* (1973), 14 Ill. App. 3d 97, 302 N.E.2d 207, noted with approval from that case the statement, " 'To impose liability in the case before us would unjustly place upon defendant as a property owner a legal duty which is impossible of performance.' " (55 Ill. App. 3d 409, 410-11, 371 N.E.2d 69, 70.) In *Martin* the plaintiff sought recovery for alleged malfunctioning locks. Both a lock and a burglar alarm are used for protection, and there is no basis for a different application of the law in such cases.

In a comparatively recent case the Appellate Court, Fifth District, was confronted with a situation where a negligence action was brought against shopping mall owners by customers who were assaulted in the mall's parking lot by a third party. Summary judgment was entered by the trial court in favor of the owners, and this judgment was sustained by the reviewing court which held, *inter alia*, that owner's knowledge of shoplifting and thefts which had occurred on the premises was not sufficient to give rise to a duty to protect customers from assaults by third persons, and the fact that owners agreed to provide security personnel under the common areas care and maintenance clause in their lease with store owners could not be

construed as a voluntary undertaking to protect all shopping mall customers from criminal attacks. (See *Taylor v. Hocker* (1981), 101 Ill. App. 3d 639, 428 N.E.2d 662.) We find pertinent to the determination of the instant case the following language in the court's opinion in the case of *Taylor*.

"Finally, relying on *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 399 N.E.2d 596, the plaintiffs maintain that defendants had a duty based upon a voluntary contractual undertaking. In *Pippin*, our supreme court held that a security services corporation was liable for harm suffered by criminal attacks on premises owned and operated by the Chicago Housing Authority where the corporation specifically agreed to provide ' "*** protective services for the purpose of guarding [the Authority's] properties *** and protection of persons thereon." ' (*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 207, 399 N.E.2d 596, 599.) Here, the plaintiffs' claim is based upon the 'Common Area Charge' clause of the lease defendants entered into with the lessees of the various stores in the shopping center. This provision placed responsibility upon defendants for maintaining security personnel in, on, and about the Common Areas. It is evident that the undertakings alleged in *Pippin* and in the present case are dissimilar. In the instant case, when broadly interpreted, the lease provision relied upon by the plaintiffs does not, as in *Pippin*, provide for the protection of third persons from criminal attacks." 101 Ill. App. 3d 639, 643-44, 428 N.E.2d 665-66.

The briefs of the parties to this appeal are replete with citations of cases relating to a landlord's duty to protect tenants from criminal acts by third parties. The cases heretofore set forth, to-wit, *Stelloh, Martin* and *Taylor*, involved, respectively, in *Stelloh* the employment of a private police force for added protection to tenants and failure to warn, in *Martin* broken door and window locks, and in *Taylor* the failure of security personnel hired to maintain security measures in common areas to prevent harm to all shopping mall customers. The common thread running throughout these cases is that the reviewing court recognized that the landlords undertook to provide measures which would provide added protection from crime to their tenants. The acts of the landlords rose from contractual obligations and did not constitute a voluntary undertaking to protect tenants from harm from third persons or to provide security to certain areas.

Among the cases cited by the plaintiff in support of her contention that her complaint states a cause of action are four involving the

Chicago Housing Authority: *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 399 N.E.2d 596; *Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, 412 N.E.2d 472; *Phillips v. Chicago Housing Authority* (1982), 89 Ill. 2d 122, 431 N.E.2d 1038; and *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, 340 N.E.2d 47. In *Pippin* our supreme court held that a security services corporation was liable for harm suffered by criminal attacks on premises owned and operated by the Chicago Housing Authority where the corporation specifically agreed to provide protective services for the purpose of guarding the authority's properties and the protection of persons thereon. Our supreme court held that the Chicago Housing Authority did not have a duty to protect social guests and its duty was limited to the use of reasonable care in engaging corporations to provide guard services and thus could be liable at the most for the negligent hiring of corporations.

In *Cross* the plaintiff was injured by assault at the housing project. The plaintiff sued the Chicago Housing Authority and a security service which had contracted with the authority to provide guard services. The security service provided protection between 9 a.m. and 1 a.m. The plaintiff was assaulted at 1:15 a.m. after the guards had left the premises. Our supreme court held that the housing authority, which undertook to provide part-time guard service at the project, was obligated to use reasonable care not to create increased dangers to persons lawfully on its property and a complaint stating that the part-time guard service substantially created the incidence of crime after 1 a.m., and that the authority was aware of such upsurge of criminal activity and negligently took no action to provide protection from it, stated a cause of action on which relief could be granted.

In *Phillips* the plaintiff sued the Chicago Housing Authority for the wrongful death of plaintiff's decedent, a minor daughter, which occurred on a floor of a building which was allegedly closed off and made secure by the authority in order to prevent the commission of crimes which had occurred in such area a long time prior to the minor's death. Our supreme court sustained a complaint which alleged that the authority had voluntarily undertook to secure certain floors and had performed the undertaking negligently.

In *Stribling*, plaintiffs alleged that the Chicago Housing Authority allowed free and unhindered access to vacant apartments and that their apartment was burglarized upon three occasions and that each time entry was made by breaking through a wall connecting plaintiffs' apartment with a vacant adjacent apartment. The reviewing court held that the defendant owed plaintiffs a duty to guard against the

second and third burglaries because defendants had notice of the original burglary and the means used in effecting the same. The court, however, found no such duty regarding the first burglary even though plaintiffs alleged it was due to defendant's failure to secure the vacant apartments when it knew of unauthorized persons on the premises.

In examining the foregoing we find that a limited duty has been imposed on the landlord in certain situations. In *Pippin* it was held that a security corporation could be liable where it assumed the duty of protecting of persons on property which it had undertaken to guard. The landlord's liability was limited to any negligence committed by it in hiring the service. In *Cross* it was established that a landlord can be liable for creating an increase in danger to persons lawfully on its property. In *Phillips* the landlord's alleged negligence which stated a cause of action was to allow criminals access to portions of an apartment building. In *Stribling* intruders used the same access to plaintiff's apartment on three occasions.

We further note that the plaintiff strongly urges that the case of *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E.2d 769, is supportive of her contention that her complaint states a cause of action. Our supreme court in *Nelson* held that a general contractor's compensation liability insurer, which gratuitously undertook to make safety inspections of project, was not immune from suit for personal injuries resulting from a hoist which fell. The thrust of the holding in *Nelson* is that liability can arise from the negligent performance of a voluntary undertaking. This principle of law set forth in *Nelson* was relied upon in *Pippin* to hold the landlord liable to a limited extent, to-wit, for any negligence committed in hiring a security service for guard purposes. The principle was again recognized and relied upon by our supreme court in the case of *Phillips* to hold the landlord liable. In *Phillips* the extent of the landlord's voluntary undertaking was to close off and secure certain floors to prevent the commission of crimes. The plaintiff has attempted to apply the law of *Nelson* to the factual situation in the instant case. To do so would result in a tortuous path of reasoning, for the record before us is devoid of any evidence which would show that the defendants assumed a duty to protect the plaintiff from injury. The insurer in *Nelson* by his investigation assured the injured parties that they were safe. The defendant in the instant case made no such assurance.

The defendants installed a burglar alarm and at the most had a contractual obligation to keep the same operable. The defendants did not voluntarily or contractually promise the plaintiff that she would

be protected from criminal harm by third parties. If liable, the liability of the defendants is limited to those damages foreseeable by the breach of their duty to repair the burglar alarm, to-wit, the cost of paying an alternative repairman. The contractual breach would not entail damages for harm caused to the plaintiff by the intervening criminal act of a third party.

■ The plaintiff's complaint fails to allege facts that would establish that the inoperable burglar alarm was the proximate cause of the harm inflicted upon her. The evidence also fails to show that the defendants' acts or omissions to act were the proximate cause of the harm. It is apparent that plaintiff's theory is that if the alarm had been operable it would have been activated when the assailant pried open a window, thereby frightening him to the extent he would have fled. To accept this theory it would be necessary to engage in speculation and conjecture. Would the plaintiff or her boyfriend have set the alarm on the night in question? Would the assailant have been frightened and fled or did he by prior surveillance know that the apartment at the time of his entry was vacant? The answers to these questions can only be speculated. A case similar to the instant case is *Libby, McNeill & Libby v. Illinois District Telegraph Co.* (1938), 294 Ill. App. 93, 13 N.E.2d 683. We will not engage further in setting forth an analyzation of a cited case; however, *Libby* deals precisely with a proximate cause question such as the one present in the instant case and we believe it is controlling. *Libby* held that a jury should not be permitted to speculate as to questions of fact and that where precise cause of plaintiff's loss is left to conjecture, then plaintiff cannot recover, and evidence should not be submitted to the jury.

For the reasons set forth the judgment of the circuit court of Peoria County is reversed.

Reversed.

BARRY, P.J., and HEIPLE, J., concur.