SECOND DIVISION

September 23, 1997

No. 1-96-2104

JOYCE KOLODZIEJZAK, Indiv. and as ) Appeal from the

Special Adm'r of the Estate of ) Circuit Court of

David Kolodziejzak, Deceased, ) Cook County.

Plaintiff-Appellee, )

)

v. )

)

MELVIN SIMON & ASSOCIATES, )

SIMON MANAGEMENT COMPANY, CORPORATE)

SECURITY CONSULTANTS, INC., Indiv. )

and d/b/a YARDS SECURITY, )

Defendants-Appellants. )

----------------------------------- 

MELVIN SIMON & ASSOCIATES, ) 

SIMON MANAGEMENT COMPANY, CORPORATE) 

SECURITY CONSULTANTS, INC., Indiv. ) 

and d/b/a YARDS SECURITY, )

Third-Party Plaintiffs- )

Appellants, )

)

v. ) Honorable

ADIEL CUEVAS, ) Jennifer Duncan-Brice,

Third-Party Defendant. ) Judge Presiding.      

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Plaintiff Joyce Kolodziejzak brought this wrongful death action against defendant Simon Management Company and other defendants on behalf of the estate of David Kolodziejzak (Kolodziejzak).  The jury found in favor of plaintiff and allocated 10% of the fault to Simon Management.  The trial court entered judgment on that verdict.  Simon Management appeals, contending that the trial court erred in denying its motion for a directed verdict because: (1) Simon Management did not owe any duty to protect David Kolodziejzak from criminal attacks by third parties; (2) plaintiff failed to present any evidence that Simon Management's alleged negligence was the proximate cause of Kolodziejzak's injury; and (3) plaintiff failed to present any evidence that Simon Management negligently hired the security company Corporate Security Consultants Inc. (Corporate Security).  Simon Management also claims that the jury's apportionment of fault was unreasonable and contrary to the evidence, and that the trial court erred in denying Simon Management's motion to bar the testimony of plaintiff's expert witness.  We reverse the trial court order entering judgment on the jury's verdict, and we enter judgment in favor of Simon Management.   In the fall of 1990, a strip mall, named Yards Plaza, opened at 47th and Damen Avenue in Chicago.  Simon Management was the property management company for Yards Plaza.  On October 31, 1990, Simon entered into a one-year contract with Corporate Security pursuant to which Corporate Security was to provide security service to the common areas of Yards Plaza.  Corporate Security guards were to patrol the exterior of the Plaza and do security checks of the main lot and parking areas.  On November 13, 1991, Simon Management’s contract with Corporate Security was renewed for another year.  

On November 24, 1990, Montgomery Ward signed a lease to become a tenant store at Yards Plaza.  On November 25, 1990, at approximately 4 p.m. Terry Minor, a Montgomery Ward loss prevention specialist, was on patrol inside Montgomery Ward, when he saw six teenagers fighting in the "Electric Avenue" department.  Minor called a "Code 600" over his radio, indicating that he needed help and calling all available loss prevention specialists to the "Electric Avenue" department. Loss prevention specialists David Kolodziejzak and Algis Kivenas proceeded to the "Electric Avenue" department, talked to Minor about the disturbance and went looking for the teenagers.  Kolodziejzak yelled to Kivenas that he saw a shoplifter, and Kivenas then saw Adiel Cuevas carrying a gun and running out of Montgomery Ward.  

Michael Gercone, the Corporate Security guard on duty at the time, heard the "Code 600" and drove toward Montgomery Ward.  Gercone saw Cuevas running, followed by Kolodziejzak. As Kolodziejzak was about to apprehend Cuevas, Cuevas turned and fatally shot Kolodziejzak.  At the time of the shooting, Gercone was about 20 to 30 yards away from Cuevas.

Plaintiff brought suit against Simon Management, Corporate Security, Montgomery Ward and Cuevas.  The jury found in favor of plaintiff and attributed 10% of the fault to Simon Management, 10% to Corporate Security, 25% to Montgomery Ward and 35% to Cuevas.

Simon Management first claims that the trial court erred in denying its motion for a directed verdict because Simon Management did not owe plaintiff's decedent any duty to protect him from criminal attacks by third parties.  The determination of the existence of a duty is a question of law to be resolved by the court.  
Vesey v. Chicago Housing Authority
, 145 Ill. 2d 404, 583 N.E.2d 538 (1991).  As a general rule, a landlord owes its tenants no duty to protect them from criminal attacks by third parties. 
Pippin v. Chicago Housing Authority
, 78 Ill. 2d 204, 399 N.E.2d 596 (1979).  However, an exception to this rule exists when a landlord voluntarily undertakes to provide security services, in which event, he assumes a duty not to be negligent in the performance of that undertaking.  
Pippin
, 78 Ill. 2d at 209-10.  The extent of the landlord's liability is strictly limited by the scope of the undertaking.  
Phillips v. Chicago Housing Authority
, 89 Ill. 2d 122, 431 N.E.2d 1038 (1982).  When a landlord hires a security firm to provide security services, he may be liable for negligent hiring.  
Pippin
, 78 Ill. 2d at 210.  When a landlord undertakes security measures himself, he has a duty of reasonable care in that undertaking.  
Phillips
, 89 Ill. 2d at 127.

In 
Pippin
, the Chicago Housing Authority (CHA) hired Interstate Service Corporation to provide guard services on CHA premises.  Plaintiff, a guest on the premises, was stabbed by a third party.  The court found that, because the CHA did not undertake to perform the guard service itself, it could not be held to have a duty to protect plaintiff.  The CHA’s duty was limited by the extent of its undertaking, which was to use reasonable care in hiring Interstate to provide the guard services.  The court therefore determined that the CHA could be liable only for the negligent hiring of Interstate.  Because plaintiff’s complaint alleged that the CHA negligently hired Interstate, a question of fact as to the CHA’s liability existed, and summary judgment was improper.     

The plaintiff in the instant case claims not only that Simon Management had a duty to use reasonable care in hiring Corporate Security to provide the security services, but also that Simon Management undertook a duty to oversee the security force.  Plaintiff has presented no evidence to support her negligent hiring claim.  Plaintiff instead focuses on her theory that Simon Management undertook a duty to oversee whether the security program in force was effective.  Plaintiff claims that Simon Management breached this duty by having no competent system for following upon the information reporting violent crimes that was being provided to it by Corporate Security and by failing to hire additional security guards after being notified of the need for increased security by Corporate Security.

In seeking to expand Simon Management's duty beyond that of using reasonable care in hiring Corporate Security, plaintiff relies on 
Martin v. McDonald's Corp.
, 213 Ill. App. 3d 487, 572 N.E.2d 1073 (1991).
  The plaintiffs’ claims in 
Martin
 arose out of a murder and robbery that occurred at the restaurant after closing hours.  The plaintiffs claimed that McDonald's Corporation owed them a duty of care and protection because it voluntarily assumed such a duty.  In finding that McDonald’s Corporation had in fact assumed such a duty, the court relied on the fact that McDonald's Corporation created a branch of its corporation to deal with security problems and prepared a bible for store security operations.  The bible set forth the security procedures to be followed at closing time.  One such procedure established that garbage was to be taken out a glass side door one hour before closing, rather than taken out the back door after dark.  Through its regional security manager, McDonald's Corporation undertook the obligation to check for security problems, to communicate to the store management what the security policies were, and to follow up to be certain that the recommended security procedures were being followed. However, the regional security manager admitted that he did not follow up to see if proper closing procedures were being followed.  He never checked to be sure that the back door was not being used after dark or that signs were posted on the door warning employees not to use this door after dark.  The regional security manager never checked to be sure that the workers received proper instructions about the use of the back door.  In fact several employees testified that they had never received a security manual and had never been instructed not to use the back door after dark.  Furthermore, the regional security manager failed to notice the dumpster that was pulled up to the back door after dark so that employees could dump garbage out the back door.  

The court therefore concluded that McDonald's Corporation assumed the duty to provide security and protection to plaintiffs, which included follow-up, and that there was sufficient evidence for the jury to determine that McDonald's Corporation breached its duty to plaintiffs when it failed to follow up to see the if security policies were being followed.  See also 
Decker v. Domino’s Pizza, Inc.
, 268 Ill. App. 3d 521, 644 N.E.2d 515 (1994)(Domino’s Pizza assumed a duty to protect its employees when it became directly involved in providing its employees with security procedures and mechanisms and conducting follow up to make sure that the safety procedures were being followed).

 
In 
Martin
, McDonald’s Corporation was the party actually providing the security services to its stores.  In the instant case, 
Simon Management did not provide any security measures itself but, instead, hired Corporate Security to perform security services.  Plaintiff, however, claims that Simon Management, like the defendant in 
Martin
, 
undertook an obligation to follow up to determine whether proper security procedures were being followed.  Plaintiff claims that a reasonable jury could have concluded from the testimony adduced at trial, that Simon Management did not have a competent system in place for conducting such follow-up and that, although advised on the need for additional security, failed to hire an additional guard.  

Plaintiff relies primarily on the testimony of Kathy Dernell, Simon Management's operations supervisor.  Dernell testified that she was responsible for overseeing the day-to-day operations of Yard's Plaza, which included overseeing the landscaping, snow removal, and asphalt repair, looking for trip hazards on the sidewalks, showing the retail space, and reviewing daily log reports sent to her by Corporate Security.  Dernell testified that she had no formal training or experience on security matters. 

Dernell testified that, in 1990, she gathered proposals from several security companies and sent them to Tom Cernock, who was the technical services security expert for Simon Management.  Cernock negotiated and signed the contract with Corporate Security.  According to this contract, Corporate Security was to send to Simon Management daily log and incident reports regarding events that occurred at Yards Plaza.  

Once a month, Gene Motyka, the director of Corporate Security, sent these daily log reports to Dernell.  Dernell testified that she reviewed the reports to assess whether the security guards were properly performing their jobs and whether the overall security program was effective.  Dernell testified that, while reviewing the reports, she would automatically consider whether the incident was handled correctly and how it could have been handled better.  

Barbara Barnes the property manager did not actually review the log reports.  However, if Dernell found that a security guard was doing something inappropriate, she would notify Barnes.  Dernell also reported to Barnes incidents involving graffiti, loitering, and vandalism.  

Dernell testified that she was in contact with Motyka once a week to discuss incidents occurring at the shopping center.  Dernell also testified that after reading the log reports, if she had any questions or concerns regarding a reported incident, she would contact Motyka and obtain more information about the incident and if necessary correct the situation.  Dernell testified that she was always satisfied with the work and conduct of the Corporate Security guards.  Dernell testified that when she reviewed the daily log reports, she found that the neighborhood was not as bad as she had been led to believe when the mall opened.     

Dernell testified that Motyka would occasionally recommend that Simon Management hire an additional guard during holidays or special events held at the shopping center.  Dernell would pass this information on to Barnes, and Barnes would then get approval to hire an additional guard from Cernock.

Plaintiff claims that Dernell's testimony reveals that Simon Management had no competent system for following up on the information that was being provided to it by Corporate Security.  Plaintiff claims that changes in security could only have been initiated by Dernell, but because Dernell had no security training or any security experience, she was not qualified to assess and monitor the security program.  Specifically, plaintiff claims that it was reasonable for the jury to conclude that Simon Management was advised of the need for increased manpower and that Dernell should have notified her manager of the request, and the security plan should have then been evaluated and revised to meet the changing and increased security needs of the shopping center.

Plaintiff claims that Gene Motyka, director of Corporate Security, notified Dernell of the need for increased manpower.  Plaintiff relies on a letter Motyka sent to Dernell on June 24, 1991, suggesting that an additional guard be hired for the 4 p.m. shift due to the likelihood of increased customer traffic due to school letting out for the summer.  Motyka testified that he recommended an additional guard for the summer, not for November, when this shooting incident occurred.  Motyka testified that the level of security at Yards Plaza was adequate on November 25, 1991, and that he never suggested that security be increased on Monday afternoons in November.  Motyka testified that one reason for writing the letter was to increase business for his company.

Thus, even if we were to broaden the landlord's duty beyond that of reasonable care in hiring the security company, it would be difficult to find a duty that Simon Management undertook that it failed to fulfill.  In 
McDonald's
, there were specific acts of follow-up that defendant undertook a duty to perform, but admittedly failed to perform.  Here, the only specific duty Simon Management undertook was the duty to review the daily log reports.  The evidence reveals that Simon Management fulfilled this duty.  Dernell reviewed the log reports on a monthly basis, spoke with the director of Corporate Security on a weekly basis and reported any issues of concern to her superiors.  Simon Management had no duty to hire someone with more knowledge on security matters than Dernell to review these reports.  There is evidence of only one recommendation Corporate Security made to Simon Management that Simon Management did not implement.  While Motyka, director of Corporate Security, recommended that Simon Management hire an additional guard for summer afternoons and evenings, no additional guard was hired.  However, nobody from Corporate Security suggested the hiring of an additional guard for November 1991 when this shooting occurred.  Thus, during the relevant time frame, there is no evidence of any unfulfilled duty on the part of Simon Management.

Plaintiff further claims that Simon Management's duty to protect Kolodziejak from a criminal attack by third parties arose by virtue of the fact that prior crimes had occurred on the premises, thereby making the criminal attack on plaintiff's decedent reasonably foreseeable.  In 
Taylor v. Hocker
, 101 Ill. App. 3d 639, 428 N.E.2d 622 (1981), the court considered the issue of whether the landlord had sufficient notice or knowledge of previous criminality in the area of the shopping mall so as to give rise to a duty to protect plaintiffs from criminal attacks of third parties.  There, the lease between the landlord and the store owners provided that the landlord was responsible for maintaining security personnel in the common areas.  The landlord employed security guards to patrol the common areas of the mall, including the parking lot.  Plaintiffs, customers of the mall, were assaulted by a third party in the shopping mall parking lot.  Prior to plaintiff's assault, defendant had notice of numerous shoplifting incidents and thefts from automobiles, as well as some automobile thefts and one bicycle theft.  The only previous  incident of violence involved an irate customer striking the manager of a store located next to the mall, but not on mall premises.  The court stated that evidence of crimes against property, commonplace in all shopping centers, did not give rise to a jury question as to whether defendant owed plaintiff a duty to protect against attacks by third parties. 

Plaintiff in the instant case claims that there was sufficient evidence to support a jury finding that criminal acts and gang activities on the premises made it foreseeable to Simon Management  that a gang member would come onto the Yards Plaza premises, with a weapon, and cause great bodily injury or death to an innocent person.  However, our review of the incident reports prepared by the Corporate Security guards and the testimony introduced at trial reveals no incidents of gang intimidation, gang-related violence or the brandishing of any weapons by gang members on the Yards Plaza premises.  The incident reports reveal that retail theft was a common occurrence at Yards Plaza.  While there is a report of an armed robbery that occurred in one of the tenant stores, as well as a strong-armed robbery, these incidents were not linked to gang activity.  A report of a man with a gun under a bridge concerned an incident that occurred off the Yards Plaza's premises. Other reported incidents on the premises involved a Corporate Security guard threatened with an oil stick, automobile theft, a youth seen carrying a dagger, two juveniles fighting in front of the parking lot, and a drunk man yelling.  The only incidents linked to gang members involved the shouting of gang slogans from a car, the attempted theft of a bicycle, and the writing of gang signs in the tenant stores and in the common areas of Yards Plaza.  None of these gang related incidents involved violence.  We do not believe that any of the prior crimes would have put Simon Management on notice of the likelihood that a gang member would enter Yards Plaza's premises with a gun and shoot an innocent person.  

Even if we were to find that the occurrence of a violent incident by a gang member was foreseeable, foreseeability alone will not result in the imposition of a duty.  
Popp v. Cash Station, Inc.
, 244 Ill. App. 3d 87, 613 N.E.2d 1150 (1992).  The magnitude of the burden to guard against it and the consequences of placing the burden on defendant must also be considered.  
Popp
, 244 Ill. App. 3d  87.

In 
Shea v. Preservation Chicago, Inc.
, 206 Ill. App. 3d 657, 565 N.E.2d 20 (1990), cited by plaintiff, the court found that plaintiff's complaint sufficiently showed that the landlord assumed a duty to protect its tenant against reasonably foreseeable third- party criminal attacks proximately caused by defendant's failure to repair and maintain the apartment building's interior security door and safety lock.  The court's conclusion was based on the fact that the landlord retained control over that area of the premises and attempted to repair the broken equipment on several occasions.  The court found that a reasonable person in the landlord's position would have been aware of the risks of unauthorized entry and resulting criminal attacks by third parties caused by a faulty security door and lock.  Moreover, the court noted that the cost of repairing the door and lock was not prohibitive, given the risks of injury resulting from their malfunction.  The court further emphasized that the landlord was in the best position to guard against the risks associated with the faulty equipment.  The court noted that the factual situation in 
Shea
 was different from a case involving "a large expanse of land and buildings such as a shopping mall or university, where the cost of more extensive security measures may have been prohibitive to the landowner."  
Shea
, 206 Ill. App. 3d at 665.

In the instant case, we find that imposing the cost of protecting third parties from all criminal attacks at Yards Plaza on the landlord Simon Management Company is too burdensome.  The shopping center's common areas are large and open and Simon Management had only attenuated control over these areas.  We do not believe that Simon Management could reasonably be expected to secure this entire area.  How many guards would Simon Management have to hire to protect against any criminal act occurring in the common area of a shopping center which is open to the public?  2? 50? or 100?  Alternatively, what else could Simon Management do except erect a fence around Yards Plaza and screen all persons entering the premises?  Either of these scenarios would certainly place too onerous an economic burden on Simon Management.  

We also note that the record is devoid of any evidence showing that any action or inaction on the part of Simon Management was the proximate cause of Kolodziejzak's death.  There is no allegation that the Corporate Security guard on duty at the time Kolodziejzak was shot was negligent in his handling of this incident.  Furthermore, whether Kolodziejzak's death could have been prevented by the addition of another security guard is at best speculation and conjecture.  
Nola M. v. University of Southern California
, 16 Cal. App. 4th 421, 20 Cal. Rptr. 2d 97 (1993).       

We therefore find the trial court should have granted Simon Management's motion for a directed verdict.  In light of this determination, we need not address the other issue raised by plaintiff in this appeal.  Accordingly, the judgment entered against Simon Management is vacated and judgment in favor of Simon Management is entered.

Vacated.

RAKOWSKI, J., concurs.

TULLY, J., dissents.

JUSTICE TULLY dissenting:

I must respectfully disagree with the majority's opinion that the trial court erred in denying defendant's motion for a directed verdict.  A trial court should grant a motion for directed verdict only in those cases where all the evidence, when viewed in its aspect most favorable to the non-movant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-14 (1967).  Upon a careful review of the record, I do not find that the evidence so overwhelming favors defendant's position that no duty exists that the jury's verdict for plaintiff cannot stand.  

As the majority points out, although a landlord generally owes its tenants no duty to protect them from criminal attacks by third parties, an exception to this rule exists when a landlord voluntarily undertakes to provide security services.  See 
Pippin v. Chicago Housing Authority
, 78 Ill. 2d 204, 209-210, 399 N.E.2d 596 (1979).  In the present case, defendant undertook to provide an extensive security system on the premises.  Instead of simply hiring an outside security firm, as was the case in 
Pippin
, defendant herein sought to oversee the security services being provided by Corporate Security.  Defendant required Corporate Security to provide it with daily log reports detailing any and all incidents occurring on the premises.  Defendant also assigned one of its managers to review such reports and to determine if the security needs of the premises were being met.  Once a week defendant's manager met with the director of Corporate Security to discuss the security measures being implemented.  Plaintiff also produced evidence of at least one occasion where defendant exercised control over Corporate Security's hiring of an additional security guard for the premises.  Thus, defendant clearly retained control of the security operations on its premises even though such services were provided by an outside security firm.  When a landlord voluntarily undertakes to provide such services, it has a duty to do so in a non-negligent manner.  See 
Phillips v. Chicago Housing Authority
, 89 Ill. 2d 122, 127, 431 N.E.2d 1038 (1992).  Accordingly, I believe the evidence presented by plaintiff clearly demonstrates the existence of a duty on the part of defendant, and, as such, the trial court was correct in denying defendant's motion for a directed verdict.